KYTE, INFANT, ET AL. *v.* McMILLION

[No. 75, September Term, 1969.]

*Decided December 9, 1969.*

---

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN and SINGLEY, JJ.

*Marvin Ellin,* with whom was *Leonard Passano Baker, Jr.,* on the brief, for appellants.

*Herbert Burgunder, Jr.,* with whom was *F. Gray Goudy* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

The trial judge, Watts, J., found this case "vexing * * * and difficult to decide." Although we do not agree with the result he reached we do agree that the circumstances are extraordinary and that the single issue presented is not nearly as simple as, at first glance, it might seem. As Judge Watts put it, "[b]y stipulation the parties agree that the only issue in the case is * * * [whether the] release of Union Memorial Hospital [the subsequent tort-feasor] bar[s] an action against Rodney K. McMillion [the primary tort-feasor]." The facts, while intricate, are not in dispute.

On 3 January 1967 the appellant (Edna), then 15 years old, was a passenger in an automobile driven by the appellee (McMillion) but owned by his father. McMillion, 20 years old, did not have a license to operate a motor vehicle. There were others in the car but their identity has no significance here. Officers in a police car signalled McMillion to stop but instead of stopping he increased his speed and tried to outrun the police car which forthwith gave chase. Edna begged him to stop but he pressed on. At the intersection of The Alameda and Loch Raven Boulevard, in Baltimore City, he struck another car. Edna, seriously injured, was taken to Union Memorial Hospital, where she remained for several months.

Upon admission, the physician attending her ordered the transfusion of one unit of type Rh negative whole blood. Around 5:00 a.m. (4 January) a nurse noticed

that the plastic bag of blood was nearly empty and knowing that a second unit had been ordered for Edna she went to the blood bank, obtained the blood, brought it back to Edna's bed, replaced the empty container and started the infusion into Edna's vein "at an estimated drip of 7 to 8 drops per minute." Shortly thereafter she discovered, quite by chance, that a mistake had been made and that the blood Edna was receiving was Rh *positive* instead of Rh *negative*. Immediately she "went to a nearby medicine room, obtained a bottle of normal saline solution, ran back to * * * [Edna's] bed, turned off the blood and started the saline solution." About ¼ to ½ of a cubic centimeter of the Rh positive blood had been absorbed when the nurse turned off the flow.

Other than an itching rash which lasted less than an hour Edna suffered no other reaction as a result of this incredible mishap. There was no aggravation of her injuries. Her stay in the hospital was not prolonged thereby. She experienced no pain or discomfort except that occasioned by her broken bones. Some weeks later, however, a blood test revealed that she had "developed antibodies in a concentration of 1 to 16 saline, 1 to 32 albumin." In the opinion of Dr. Michael B. Monias, whose gynecological expertise was not challenged, "[t]here is no doubt whatsoever that if she marries an Rh positive individual, her pregnancies will be complicated. Her chances of having a dead or severely damaged baby in first pregnancy are significant. * * * In addition to the bleak prospects of future pregnancies she will have difficult gestation from both an emotional and physical point of view." Dr. Monias concluded she had suffered an "irreversible sensitization which will affect her childbearing capacity."

On 25 March 1967 Edna filed suit in the Circuit Court for Baltimore County against the hospital and the nurse. Her cause of action was based exclusively on the transfusion of the Rh positive blood. She alleged that as a result thereof "she is now fearful of her health and safety" and that being "deeply depressed and emotionally dis-

turbed" her health has suffered thereby. Answering interrogatories submitted by the defendants she attributed the pain she suffered to "her traumatic injuries." Neither did she "blame her present inability to pursue her normal activities on the negligent blood transfusion * * *" nor did she contend "that any of her present restriction or curtailment of her activities in school sports or her social life is related to the faulty transfusion." In January 1968 the case was removed to the Baltimore City Court.

The case against the hospital came on for trial in the Baltimore City Court before Judge Cole and a jury on 30 January 1968. At the conclusion of the evidence Edna's motion for a directed verdict was granted. Judge Cole instructed the jury that "in arriving at the amount of the verdict for the plaintiff" they should consider only such an amount as will reasonably and fairly compensate her for mental pain, suffering and mental anguish * * * as proximately resulting from the injury to her blood," and such an amount as will compensate her "for the adverse effects of the blood sensitization upon her daily activity and a family and social life." He further instructed them that their decision was "not to be affected merely because the plaintiff received numerous serious injuries in an automobile accident." Finally he instructed them, at Edna's request, that she was "making no claim for income that would be lost to her in the future as a result of the negligence of the defendant."

While the jury was still engaged in its deliberations the parties reached an agreement in respect of the amount of the damages, whereupon the court recalled and dismissed the jury. A few days later Edna and her mother executed and delivered the following release:

"KNOW ALL MEN BY THESE PRESENTS: That I/we the undersigned *LOIS L. KYTE, individually, and as parent and next friend of EDNA ARLENE KYTE, Infant,* for the sole consideration of *In Excess of Fifteen Thousand*

*($15,000.00)* paid to me/us by *UNION ME-MORIAL HOSPITAL, INC. and ELLEN E. OSSMAN, or their representatives* do hereby release, acquit and discharge the said *UNION MEMORIAL HOSPITAL, INC. and ELLEN E. OSSMAN and their representatives* and any and ALL OTHER PERSONS, FIRMS, PARTNER-SHIPS and CORPORATIONS which are or might be claimed to be liable to me/us from all claims and demands of whatever nature, actions and causes of action, damages, costs, loss of service, expenses and compensation on account of or in any way growing out of personal injuries and property damage having already resulted or to result at any time in the future, whether or not they are in the contemplation of the parties at the present time and whether or not they arise following the execution of this release, as the result of and by reason of *treatment rendered to the said EDNA ARLENE KYTE, infant, at UNION MEMORIAL HOS-PITAL commencing on January 3, 1967 and thereafter, specifically including but not limited to a transfusion of blood.*

"AND I/We do hereby, for myself/ourselves, my/our heirs, administrators, executors and assigns, covenant with the said *UNION ME-MORIAL HOSPITAL, INC. and ELLEN E. OSSMAN and their representatives* and any and ALL OTHER PERSONS, FIRMS, PART-NERSHIPS and CORPORATIONS which are or might be claimed to be liable to us/me as the result of the aforesaid accident, to indemnify and save harmless any and all of them from all claims and demands for damages, costs, loss of service, expenses and compensation on account of, or in any way growing out of, said accident and its results, past, present or future, both to persons or property. It is further agreed that

this RELEASE expresses a full and complete SETTLEMENT of a liability claimed and denied and, regardless of the adequacy of the compensation, is intended to avoid litigation, and that there is absolutely no agreement on the part of any or all of the said persons, firms, partnerships or corporations herein released to make any payment or to do any act or thing other than is herein expressly stated and clearly agreed to.

"Witness my/our hand(s) and seal(s) this *9th* day of *February* in the year nineteen hundred and *sixty-eight.*" (A printed form was used in preparing the release. The italicized matter was typewritten into the blank spaces.)

Within a month after the execution and delivery of the release Edna filed suit in the Baltimore City Court against McMillion who shortly thereafter pleaded the general issue. Some months later, however, after discovery procedures disclosed the fact of the suit against the hospital and the ensuing settlement and release, McMillion's counsel, with leave of court, filed an amended plea setting up the release as a bar to Edna's claim. The case came on for trial before Judge Watts, sitting without a jury, on 17 February 1969. No testimony was produced. The case was submitted on stipulations which are set forth below, paraphrased in part, in part verbatim.

Edna signed and McMillion signed and acknowledged before a notary public the following "stipulation" which was then filed as an exhibit:

"It is stipulated and agreed * * *:

"1. That the only issue in this case is that raised in Defendant's Plea which reads as follows:

" 'Plaintiffs' claims against Defendant herein and this cause of action are barred by the satisfaction of a certain cause of action filed

in the Circuit Court for Baltimore County and removed to this Court where it is docketed, 103/421, as Edna Arlene Kyte, Infant, by her mother and next friend, Lois L. Kyte vs. Union Memorial Hospital, Inc. a body corporate and Ellen E. Ossman and which case and cause of action shows a docket entry of February 13, 1968 of "AGREED, SETTLED and SATISFIED".'

"2. That should trial of this issue result in a finding in favor of Defendant, then judgment for Defendant is to be entered herein.

"3. That should trial of this issue result in a finding that Plaintiffs' claims * * * are not barred as set forth in the Plea, then judgment shall be entered herein in favor of the Plaintiffs against the Defendant, Rodney K. McMillion, in the total amount of $15,000.00.

"4. That in satisfaction of Plaintiffs' claims and action against Union Memorial Hospital, Inc. and Ellen E. Ossman as set forth in the above plea, Plaintiffs have heretofore recovered and received a sum of money in excess of $15,-000.00."

In open court counsel agreed to the introduction of the hospital records "with the further stipulation that no part * * * [thereof] is in any way involved as an expense from the blood sensitization episode .[and] that the entire bill resulted from treatment received by the plaintiff as a result of the injury suffered in the automobile accident." They stipulated further that "no part of the damages or expenses incurred as a result of the automobile accident were claimed and/or received in the first suit * * * *and the injury and damages were wholly divisible.*" (Emphasis added.) Counsel agreed that the blood sensitization occurred "in the course of treatment of injuries" sustained in the automobile accident. There was the "further stipulation that there was no mention

in the declaration [in the suit against the hospital] of any damage * * * due to the automobile accident nor any recovery made" therefor. The introduction of *Judge Cole's* instructions to the jury was also agreed upon by counsel.

Since both Judge Watts, in his opinion, and McMillion, in his brief, lean heavily upon our decision in *Trieschman v. Eaton,* 224 Md. 111 (1961), we think it may be helpful to recall not only what we said in that case, but what we held as well. There, it will be remembered, Irene Trieschman's leg was broken by O'Neill's automobile. Dr. Eaton used a steel plate to repair the break. The plate gave way while the bone was still healing necessitating additional lengthy procedures. The Trieschmans first sued O'Neill but because he had nothing and was uninsured to boot a compromise was arranged in the form of a consent judgment for $10,000 with an agreement to pay the judgment at the rate of $40 per month. It was provided that upon full payment of the $10,000 judgment O'Neill would be "released and discharged from any further liability." Suit was then filed by the Trieschmans against the hospital and Dr. Eaton. The trial judge granted a summary judgment on the ground that the release of O'Neill discharged the doctor and the hospital. Judge Hammond (now Chief Judge), for the Court, discussed in some detail the conflicting theories advanced by the parties and the authorities cited in support thereof. He said:

> "Appellants seem to assume, appellees suggest, and Judge Oppenheimer held that the 1956 agreement 'has the effect of a release to the same extent as though it had been in the more usual form.' On this premise appellants seek to avoid the rule applied by the trial court that the release of one tortfeasor discharges another who has caused or contributed to the same harm, on two main grounds. First, they claim the Uniform Contribution among Tort-Feasors Act,

Code (1957), Art. 50, Secs. 16 to 24 (hereinafter called 'the Act'), controls whether O'Neill and the doctor were joint tortfeasors or concurrent or successive tortfeasors. Section 16 of the Act says: ' "joint tortfeasors" means two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them.' It is urged that the definition is broad enough to encompass all negligent actors whose wrongs either produced or coalesced to result in, or contribute to, the same harm.

"Section 19 provides that the release by the injured person, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides but reduces the claim against the others in the amount paid for the release or in any amount or proportion stipulated if greater than the consideration paid. Therefore, if appellants are right in their contention that the Act embraces O'Neill and the doctor, the 1956 compromise with O'Neill did not discharge the doctor since it did not purport to do so.

"Appellants' second main contention is that apart from and without regard to the Act, the release of O'Neill did not discharge the doctor under the holdings of recent cases in three states which is that, in the absence of statute, the release of one tortfeasor discharges others who have caused or contributed to the same harm, whether the tortfeasor be joint, concurrent or successive."

* * *

"The reasoning of the majority decisions generally is that since the original wrongdoer is liable for the additional damages resulting from the acts of the doctor and there can be but one

satisfaction for the same injury, the satisfaction of the injured person by the first negligent actor does away with all right of action against the second."

\* \* \*

"The rule that there could be but one satisfaction of the same wrong originated at common law in the case of joint tortfeasors because there was but one cause of action—that against both. In the beginning independent wrongdoers liable for the same loss were not absolved by the release of one. Gradually the rule of release governing joint wrongdoers was extended to independent tortfeasors and it has become the law of most of the States. It was declared to be the law of this State in *Cox v. Maryland Elec. Rwys. Co., supra* [126 Md. 300]. The Court held that where one concurrent tortfeasor, who had been sued, paid an agreed amount in full to the injured person who caused to be made a docket entry in the case of 'agreed, and settled and all claims therein satisfied,' there had been full satisfaction which discharged the other tortfeasor and barred a subsequent suit against him. The Court said that unlike the rule in some States, in Maryland 'it is not essential that the party with whom the settlement is made or by whom the release is given shall be a joint *tort feasor* in order to release others from liability.'

"The opinions relied on by the Trieschmans in California, Minnesota and New Jersey are by Courts which either had not before followed the rule that the release of one concurrent or successive tortfeasor discharged the other, or repudiated it in reaching the result that the injured person could sue the doctor, although he had compromised his claim against the original wrongdoer. These cases hold in essence that unless the release in terms discharges the other

tortfeasors or the amount paid for the release was intended to be and was full satisfaction, the earlier settlement does not bar the subsequent suit.

"Prosser, *op. cit.*, Sec. 46, p. 244, opines that the rule that all joint tortfeasors are released by the release of one, 'seems at best an antiquated survival of an arbitrary common-law procedural concept, and it has no reasonable application to cases of mere concurrent negligence.' An appealing argument can be made that since the Maryland Legislature did away with the rule as to joint tortfeasors by the passage of the Act, the foundation and reason for the same rule being applicable to concurrent tortfeasors was done away with, and this Court should so recognize." *Id.* at 113-115, 117-118.[1]

Although Judge Hammond found the question posed by the contentions of the parties to be interesting, he went on to say:

"* * * [I]n the view we take of the case we do not reach the need to decide at which the judicial finger of approval shall be pointed."

\* \* \*

---

1. Recent decisions applying the "majority" view are *Cannon v. Pearson*, 383 S.W.2d 565 (Tex. 1964), and *Fletcher v. Hand*, 358 F. 2d 549 (D.C. Cir. 1966) (Va. law applied). In addition to those decisions by the courts in California, New Jersey and Minnesota, noted by Judge Hammond in *Trieschman* as adhering to the "minority" view, are the following: *Young v. State*, 455 P. 2d 889 (Alaska 1969); *Steeves v. Irwin*, 233 A. 2d 126 (Me. 1967); *Leech v. Bralliar*, 275 F. Supp. 897 (D. Ariz. 1967); *DeNike v. Mowery*, 69 Wash. 2d 357, 418 P. 2d 1010 (1966); *Hansen v. Collett*, 380 P. 2d 301 (Nev. 1963); *Selby v. Kuhns*, 345 Mass. 600, 188 N.E.2d 861 (1963); *Derby v. Prewitt*, 12 N.Y. 2d 100. 236 N.Y.S. 2d 953, 187 N.E.2d 556 (1962); *Rudick v. Pioneer Mem. Hosp.*, 296 F. 2d 316 (9th Cir. 1961) (Ore. law applied). *See also Wheat v. Carter*, 79 N. H. 150, 106 A. 602 (1919). The commentators, as Judge Hammond also points out, support the "minority" view. *See* W. Prosser, *Torts* § 46 at 272 (3d ed. 1964); 1 F. Harper & F. James, *Torts* § 10.1 at 711 (1956); Prosser, *Joint Torts and Several Liability*, 25 Cal. L. Rev. 413 (1937). An excellent annotation in 40 A.L.R.2d 1075 (1955) collects cases applying both rules. *See also* 76 C.J.S., *Release* § 50 (1952).

"All that the agreement to settle amounted to in essence and substance was the entry of a judgment payable over more than a twenty-year period in small monthly instalments. It is obvious on the slightest reflection that if O'Neill defaulted, the Trieschmans had nothing but a partially satisfied judgment against an execution proof debtor. This only serves to put in clear focus that they had no more, at the time they sued the doctor."

\* \* \*

"The arrangement between O'Neill and the Trieschmans amounted to no more than a judgment which at the time suit was filed against the doctor was but partially satisfied. It is apparent that the arrangement was no more satisfaction in fact than it was in the eyes of the law, and therefore that the doctor was not absolved from whatever responsibility he may have to the Treischmans, if any, and that the Trieschmans' right to proceed against him was not barred as a matter of law." *Id.* at 119-120.

Although, for the reasons stated above, *Trieschman* was reversed and remanded we shall assume that the four judges who heard and decided it would have affirmed the trial judge if the $10,000 judgment had been paid or otherwise satisfied before the suit against the hospital and Dr. Eaton had been tried and that the Court as now constituted would reach the same result but it is clear, we think, that there are distinguishing features between *Trieschman* (in either posture) and the case at bar. Indeed, we seem never to have considered a like set of facts nor, as far as we have been able to discover, has any other court, except the Court of Appeals of New York. *Parchefsky v. Kroll Bros.,* 267 N. Y. 410, 196 N. E. 308 (1935), presents an analogous situation which we shall discuss later on.

An immediately obvious distinguishing feature of the

instant case arises out of the fact that the subsequent tort-feasor, rather than the original tort-feasor, was first sued and released. There is little doubt, as Judge Hammond has said, that the majority rule is that "the original wrongdoer is liable for the additional damages resulting from the acts of the doctor and there can be but one satisfaction for the same injury." Thus applying that rule and assuming liability on the part of McMillion a release by Edna to him would have discharged the hospital and its nurse. It is not at all clear, however, that the converse would be true but that question, in respect of the blood mishap, can be finessed because Edna does not now contend that there is any residual liability in McMillion for the hospital's negligence.

Unlike *Trieschman,* where the injury inflicted by the original wrongdoer was aggravated and extended by the subsequent wrongdoer, the blood mishap in the case at bar had no impact whatever on the injuries sustained by Edna in the collision. As we have said, she suffered no additional pain or discomfort, her stay in the hospital was not extended thereby, her convalescence was not impaired, no extra treatment was required and her subsequent disability was not exacerbated. Except for the hazards which may be involved in pregnancy and parturition it cannot be said that her condition is, in any respect, different from what it would have been if the blood incident had not occurred.

In *Trieschman* the motor tort occurred on 14 September 1954; the hospital tort occurred on 8 November 1954, seven weeks later. The release to O'Neill was dated 7 August 1956, nearly two years later. It recited the original tort and the fact that her injuries had "disabled * * * [her] for a considerable period of time, causing *continued permanent pain and suffering* and having resulted in the *expenditure of considerable sums of money for hospital care and other expenses."* It recited further that suit had been filed *"to recover for the losses and injuries sustained as above set forth."* (Emphasis added.) It was not suggested that the pain, suffering and the

costs incurred as a result of the accident should have been segregated from the pain, suffering and expenses incurred on account of the alleged malpractice nor was any attempt made in this direction. In the case at bar the hospital and its nurse were sued first. Recovery was sought *only* for the negligent blood transfusion; specifically excluded were any damages arising out of "her traumatic injuries." And as we observed early on, Judge Cole instructed the jury to restrict the verdict to an amount calculated to compensate Edna "for the adverse effects of the blood sensitization." In the same instruction he cautioned them against giving any consideration to any income that might be lost to her in the future as a result of the negligence of the hospital and its nurse. The matter was further refined, in the instant case, by the stipulation that "there was no mention in the declaration [against the hospital] of any damage * * * due to the automobile accident *nor any recovery made therefor*" (emphasis added), and by the stipulation that the hospital bill was devoid of any charge arising out of the blood incident.

Another significant and important distinguishing feature of the case before us is the stipulated concession that the injuries sustained by Edna in the automobile accident and the sensitization brought about by the blood mishap are *"wholly divisible."* (Emphasis added.)

It comes to this, then: while we shall adhere to the rule that "there can be but one satisfaction for the same injury" it would be a gross distortion of both the English language and the facts of this case to say that Edna's broken bones and the dyscrasia of her blood are the "same injury." Moreover the cases, such as they are, seem to support the notion that she sustained two injuries for only one of which has she received satisfaction.

The plaintiff in *Frost v. Des Moines Still College of Osteopathy and Surgery*, 248 Ia. 294, 79 N.W.2d 306

(1956), suffered a back injury in an automobile accident in January 1953. Some months later, conservative treatment having proved to be ineffective, surgery was advised and soon thereafter she underwent an operation on her back. After surgery she complained of pain in the abdominal area and on the following morning the surgeon observed first, second and third degree burns on her abdomen. It was thought, but there was no proof, that the burns were caused by ether used in the preparation of the skin in the surgical area. The court said:

> "Appellant also complains of the court's ruling excluding defendant's Exhibit 54, the same being the record of a settlement between the American Automobile Insurance Co., carrier of insurance for the other party involved in the original automobile collision. Defendant claims this evidence of settlement competent, for its effect was to work a satisfaction of any claim plaintiff had against defendant. However, we do not agree that the cause brought herein was for an *aggravation of the original injury but was, as plaintiff contends, a new and separate cause of action due to a new and distinct injury* affecting a different part of plaintiff's anatomy, and one which defendant alone was accused of inflicting upon her. Therefore, defendant's release of the original tort-feasor does not bar the present action for damages due to the new and unrelated injury. The exhibit was properly rejected. *Piedmont Hosp. v. Truitt,* 48 Ga. App. 232, 172 S. E. 237; *Andrews v. Davis,* 128 Me. 464, 148 A. 684; *Noll v. Nugent,* 214 Wis. 204, 252 N. W. 574." *Id.* 79 N.W.2d at 314-315. (Emphasis added.)

In *Corbett v. Clarke,* 187 Va. 222, 46 S.E.2d 327 (1948), the plaintiff sued a dentist for malpractice. He (the dentist) filed a plea alleging that she had sued another dentist and had given him a release. The Supreme

Court of Appeals, in reversing the dismissal of her suit, said:

"The facts alleged in the replication and amended notice of motion reveal two separate and distinct torts. The original tort feasors, in extracting plaintiff's tooth, left the root in the gum and refused to give further treatment. The second tort, or series of torts, committed by defendant was not in the removal of the root of the broken tooth, but the extraction of another tooth, sewing up a foreign substance in the cavity, and the subsequent failure to find and remove the foreign substance from the wound. These subsequent negligent acts were more than the aggravation of the original injury. In the present advanced stage of medical science, it is not reasonable to anticipate that a dental surgeon will be so grossly negligent as to fail to remove absorbent cotton or other foreign substance from an opening in his patient's body before closing or sewing up the incision resulting from an operation. To so hold would strain the usual and normal concept of 'proximate cause' to the breaking point." *Id.* 46 S.E.2d at 329.

In *Piedmont Hospital v. Truitt,* 46 Ga. App. 232, 172 S. E. 237 (1934), cited in *Frost v. Des Moines Still College of Osteopathy and Surgery, supra,* and in *Corbett v. Clarke, supra,* the court said:

"* * * In the instant case the plaintiff was injured by reason of an automobile collision. She suffered severe injuries, including an injury to her vertebra. She was removed to a hospital, where she was treated by her physician. This physician prescribed treatment of her spine with an electric pad, and instructed the nurse, of the defendant hospital, as to how the treatment should be administered. He had given

plaintiff medicine to produce sleep and relieve her pain. She fell asleep. The nurse of the defendant failed to properly administer treatment to plaintiff with the electric pad, as instructed by plaintiff's physician, and as a result plaintiff was badly burned about her back, stomach, and sides, * * *. Plaintiff executed a release, in consideration of a sum paid to her by the person who injured her in the automobile accident, in which she released that person from 'all claims, demands, damages, actions, or causes of action, on account of injuries resulting, or to result, from' said automobile accident. The plaintiff did not sue the defendant hospital for damages on account of injuries sustained in said automobile accident, but solely for damages on account of the injuries suffered by reason of said burns so inflicted upon her. * * * It can hardly be said that the person injuring plaintiff with the automobile, and the defendant hospital that injured plaintiff with the electric pad by burning her, were joint tort-feasors in the commission of the same tort upon plaintiff." *Id.* 172 S. E. at 239.

An early Massachusetts case, *Purchase v. Seelye,* 231 Mass. 434, 121 N. E. 413 (1918), involved a railroad worker who suffered a rupture in his right groin. He consulted a physician who operated on him on the day following. When he complained that the surgery had been done on his *left* side, the physician said: "I took you for another patient of mine that had a hernia on the left side. Well, the only thing we can do is to operate on the right side in about two or three days." The question arose whether his settlement with the railroad barred his malpractice action against the physician. The court said:

"* * * There was sufficient evidence to show that the defendant made a mistake in the iden-

tity of the plaintiff at the time the operation was performed and that he then believed he was operating upon another patient who had a hernia on his left side. The reason why a wrongdoer is held liable for the negligence of a physician whose unskilful treatment aggravates an injury, is that such unskilful treatment is a result which reasonably ought to have been anticipated by him.

"The railroad company could not be held liable because of the defendant's mistaken belief that he was operating upon some person other than the plaintiff; such a mistake was not an act of negligence which could be found to flow legitimately as a natural and probable consequence of the original injury, and a ruling in effect to the contrary could not properly have been made. The fact that the mistake made by the defendant might possibly occur is not enough to charge the railroad company with liability; the unskilful or improper treatment must have been legally and constructively anticipated by the original wrongdoer as a rational and probable result of the first injury. This is the true test of responsibility, and it cannot be extended to cover the facts in the present case as shown by the record.

"If a surgeon employed to operate upon a patient for hernia caused by the negligence of another, instead of performing that operation removes one of the patient's kidneys (which is in sound condition) under the mistaken belief that he is treating another patient, can it reasonably be held that such a mistake is something that might sometimes follow, and as a matter of common knowledge and experience might be expected sometimes to follow, from an injury resulting in hernia? We think not. We

are of opinion that the act of the defendant in operating on the wrong side, was a wholly wrongful, independent and intervening cause for which the original wrongdoer was in no way responsible." *Id.* 121 N. E. at 414.

If the ether burns sustained by the plaintiff in *Frost, supra,* constituted a "new and unrelated injury," if the electric pad burns in *Piedmont, supra,* were not the "same tort," if extracting the wrong tooth in *Corbett, supra,* was a "separate and distinct tort," and if the surgery on the left groin instead of the right groin in *Purchase, supra,* was a "wholly wrongful, independent and intervening" act, it would seem to follow that the hospital's infusion of the wrong type blood into Edna's veins and McMillion's breaking of her bones can hardly be said to be the "same injury." But even if we reject the notion that the negligent transfusion was not a part of nor a continuation of the same injury, the judgment below ought to be overturned for other reasons.

As we have said the immediately obvious feature of the instant case which also seems to distinguish it from *Trieschman* is that the claim against the hospital was compromised, settled and satisfied before any action was taken against the original tort-feasor, McMillion. The comment of Judge Fuld (later Chief Judge) of the Court of Appeals of New York in *Derby v. Prewitt,* 12 N.Y.2d 100, 236 N.Y.S.2d 953, 187 N.E.2d 556 (1962), is both interesting and persuasive:

"That the release of one tort-feasor must necessarily release all other tort-feasors who are jointly liable for the injury can hardly be regarded as an inexorable principle when its consequences may be avoided by the simple expedient of a reservation in the release of rights against the others. The ancient rule, on the contrary, rests upon two grounds: the first, that the injury resulting from the joint action of the

wrongdoers is a single injury and constitutes basis for a single cause of action (see Duck v. Mayeu, [1892] 2 Q.B. 511; sec, also, Havighurst, Settlements and Co-Obligors, 45 Corn. L.Q. 1, 6) ; the second, that it must be presumed that a settlement with one of the joint tort-feasors represents a full satisfaction of the entire claim and that any further recovery would involve double compensation for the same injury. (See Cocke v. Jennor, Hob. 66 [1614] ; see, also, Havighurst, loc. cit., 45 Corn. L.Q. 1, 4.) Whatever validity these reasons may have in the case of true joint tort-feasors, neither is persuasive where the tort-feasors did not combine to produce the wrong but only share a common element of liability.

"As to the first asserted basis for the rule, it is obvious that the taxicab driver and the doctor, having neither acted in concert nor contributed concurrently to the same wrong, are not joint tort-feasors. (See Matter of Parchefsky v. Kroll Bros., 267 N. Y. 410, 413-414, 196 N. E. 308, 310-311, 98 A.L.R. 1387.) Their wrongs were independent and successive, rather than joint, and, this being so, the plaintiff had not one but two separate and distinct causes of action, one against the cab driver for the negligent operation of his vehicle and the other against the doctor for his alleged malpractice in treating the fracture which the plaintiff sustained in the automobile accident. *It is true that the driver could have been held liable for the aggravation of the injury caused by the doctor's negligence but, as pointed out above, that liability is not the result of any concept of joint wrongs but is rather the product of the familiar rule that a wrongdoer is responsible for the reasonably foreseeable consequences of his tortious act, including the negligent conduct of others.*

> *Conversely, it would defy reason to hold the* . *physician liable for injuries caused by the original wrongdoer which were not the consequences of his own carelessness, and no one suggests that a release of the doctor would completely discharge the original wrongdoer." Id.* 236 N.Y.S.2d at 957-58 (Emphasis added.)

It should be understood, of course, that Mrs. Derby settled her claim against the cab driver who injured her before she sued the physician for the negligent treatment which aggravated her injuries. The Court of Appeals of New York reversed the dismissal of her action and remanded it for trial, but it should be understood also that the court's decision, as announced by Judge Fuld (three judges dissenting), is not in accord with the majority view. Nevertheless, it is the italicized part of the quotation from his opinion which strikes a responsive note here.

We find interesting and persuasive, also, the language of Judge Lehman (later Chief Judge) who spoke for the same court in *Parchefsky v. Kroll Bros., supra,* (cited also in *Derby v. Prewitt, supra*). In that case, Parchefsky suffered a work related injury which was aggravated by the negligent treatment of the attending physician. He settled his claim against the physician *before* he instituted an action against his employer under the Workmen's Compensation law. Judge Lehman, for a unanimous court, said:

> "A person who negligently injures another is not a joint tort-feasor with a physician whose negligence thereafter aggravates the original injury. Nevertheless, the malpractice coalesces with the original injury at that point and the two independent wrongs become concurrent causes of the ultimate result. Then the position of the independent tort-feasors becomes in many respects analogous to the position of joint tort-feasors. Action may still be brought, and

recovery had, against the original wrongdoer for all the damages caused by his wrong *or recovery may be sought and obtained from the physician for the damages which follow upon his wrong. A pending action, brought against the physicians, is not an election of remedy which bars a subsequent recovery against the original wrongdoer for damages resultant from the original wrongs.* * * * None the less, 'the law does not permit a double satisfaction for a single injury,' and for that reason we have held that 'satisfaction by the original wrongdoer of all damages caused by his wrong bars action against the negligent physician who aggravated the damage.' Milks v. McIver, supra, 264 N. Y. 267, page 270, 190 N. E. 487, 488. *For the same reason it is evident that satisfaction by the physician of the damages caused by the aggravation of the original wrong must bar recovery for the same damages as part of the original wrong. Then recovery can be had against the original wrongdoer only for those damages for which satisfaction has not been made by the physician.* * * * *Thus, if after settlement of the action for malpractice in aggravating the original injury, the injured party pursued a common-law remedy against a wrongdoer who caused the injury, recovery could be had only for those damages which did not follow upon and flow from the physician's negligence."* *Id.* 196 N. E. at 310-311. (Emphasis added.)

Generally to the same effect *see Pedigo & Pedigo v. Croom,* 37 S.W.2d 1074 (Tex. Civ. App. 1931) ; *Staehlin v. Hochdoerfer,* 235 S. W. 1060 (Mo. 1921) ; *Viou v. Brooks-Scanlon Lumber Co.,* 99 Minn. 97, 108 N. W. 891 (1906) ; W. Prosser, *Torts* § 42 at 255 (3d ed. 1964) ; Restatement (Second) of Torts § 433 A, comment *c* at 435 (1965) ; Note, *Concurrent Tortfeasors: Causes of Action:*

*Satisfaction,* 18 Corn. L.Q. 257, 258-59 (1933) ; Note, *The Legal Situation Arising From the Liability of One Tortfeasor for the Subsequent Tort of Another,* 29 Col. L. Rev. 630, 634 (1929).

The question whether the amount Edna received from the hospital ought to be credited *pro tanto* so as to diminish the amount of any damages recovered against McMillion (*Parchefsky, supra;* W. Prosser, *supra,* § 46 at 272) might, in other circumstances, be a little sticky. In the case at bar, however, we think the parties, by their stipulation, have made our consideration of the question unnecessary. The language of the stipulation is precise. The "only issue" is whether the docket entry of "agreed, settled and satisfied" in the suit against the hospital is a bar to Edna's claims against McMillion. If "the trial of this issue" shall result in a finding that Edna's claims "are not barred" then *"judgment shall be entered"* in favor of Edna against McMillion "in the total amount of $15,000." (Emphasis added.) Indeed, it would be witless to argue that the parties contemplated the possibility of a credit or a set-off; the $15,000 plus settlement would have wiped out the $15,000 agreed damages making the whole business futile and senseless.

McMillion insists that he was actually included in the release in that he is an "other person" who might be liable to Edna for damages "on account of or in any way growing out of personal injuries * * * having already resulted or to result at any time in the future." But by its terms the release is limited to damages for injuries "as the result of and by reason of treatment rendered to * * * [Edna] specifically including but not limited to a transfusion of blood." The hospital was in no way responsible for Edna's broken bones—as Judge Fuld said "it would defy reason to [so] hold"—and it is quite clear that none of the money paid out on its behalf constituted recompense for that wrong. Of course, McMillion may be right in one respect; to the extent that he may have been liable for the hospital's negligence Edna's release to the

hospital would be a bar to the same claim against Mc-Million. But, as we have said, no such claim having been made, the question is not before us.

For all that has been said the judgment will be reversed and, pursuant to Maryland Rule 875 a, we shall enter judgment for Edna for damages in the amount of $15,000 and costs in the trial court, the costs in this Court to be paid by the appellee.

It should be understood, however, that the decision announced herein goes no further than the unusual facts and circumstances of this case.

> *Judgment reversed.*
> *Judgment in favor of the appellant against the appellee entered for $15,000.*
> *Costs in this Court and in the trial court to be paid by the appellee.*