**CONNEX PRESS, INC., Plaintiff,**

v.

**INTERNATIONAL AIRMOTIVE, INC. and Omni Investment Corporation, Defendants.**

**Civ. A. No. 76–0538.**

United States District Court, District of Columbia.

April 25, 1977.

Lee R. Marks, Roger Kaplan, Ronald P. Wertheim, Washington, D. C., for plaintiff.

Paul Daniel, Paul M. Vincent, Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GESELL, District Judge.

Connex Press, Inc., registered owner of a Sabreliner 60 executive jet, complains that defendant International Airmotive, Inc. ("IAM")[1] conducted an unreasonable foreclosure sale of the airplane in violation of section 9–504(3) of the Uniform Commercial Code. Maryland Code 1957, Art. 95B § 9–504(3). Compensatory and punitive damages and other relief are sought, and defendant counterclaims. The case was tried to the Court without a jury. Following extensive discovery and pretrial proceedings many facts were stipulated, numerous documents were presented, and 17 witnesses appeared at trial.

The disputed sale occurred on October 10, 1974, at the Cambridge, Maryland, airport. IAM, then the secured creditor, was the only bidder. It bid $325,000. IAM, after making substantial expenditures, sold the plane, in March, 1975, for $855,000. This was not a routine creditor transaction. The circumstances leading up to the sale, which were elaborately detailed by the evidence, will be briefly summarized.

---

1. By agreement filed February 7, 1977, and approved by the Court, the complaint is treated as solely an action against International Airmotive, Inc., and Omni has guaranteed any judgment that may be entered. References throughout will therefore be only to International Airmotive, Inc. as the defendant.

1. *Developments Leading to Foreclosure.*

Connex purchased the Sabreliner from IAM in February, 1971, under a conditional sales contract. IAM assigned the Connex note to American National Bank and Trust of New Jersey. Ownership of Connex became the subject of controversy and extensive litigation in the Bahamas where the plane was located. The Sabreliner was the principal asset of Connex, whose stock was held by Fairborn Corporation, Ltd. At the instance of Butler, who claimed to be the true principal shareholder of Connex, a Bahamian court enjoined removal of the Sabreliner on February 19, 1974. On February 20, 1974, however, Robert Vesco and his associates, who were involved in the controversy over ownership of Connex, caused the Sabreliner to be flown to Costa Rica in apparent defiance of the Bahamian court order. On February 25, 1974, at Butler's initiation, Slatter was appointed liquidator of Fairborn by the courts. Slatter determined that it was his responsibility to liquidate the Sabreliner. Accordingly he undertook to gain control of the aircraft to arrange for its sale in the United States. He authorized IAM to "repossess" the aircraft and indicated that he was contemplating selling the aircraft promptly at a seven percent commission and netting $875,000, United States currency. A quick turnover was apparently expected. IAM estimated that its expenses would be around $30,000 and was indemnified for this amount by Slatter.

IAM "repossessed" the plane by payment to Vesco's pilot and other means. Because of continuing disputes involving ownership of Connex, Slatter failed to authorize IAM to proceed with the sale. IAM therefore continued to hold the aircraft, procured hull insurance for $1,000,000, and hid the plane from various interests seeking to regain or attach it. Expenses mounted. Litigation in the Bahamas continued to delay the sale. In May, IAM offered to purchase the plane from Slatter for $800,000, after obtaining appraisals (which ranged from $700,000 to

$725,000) from three dealers. Later, in September, it made another offer to purchase the plane for $750,000. No sale eventuated, and IAM was given no authority otherwise to dispose of the aircraft.

A New Jersey bank, which continued to hold the conditional sale note, received payments through July.[2] The August payment on the Sabreliner note, however, was not made, and in early September 1974 the New Jersey bank declared the note in default and contemplated foreclosure. Any excess proceeds were to be interpleaded in a United States District Court for resolution of the conflicting claims to ownership of the aircraft.

Butler, with Slatter's knowledge, negotiated with the bank, looking toward a purchase or other disposition of the note, but these negotiations failed. IAM's expenses had continued to increase beyond original expectations because of the delay, and it was pressing to be made whole. IAM was in constant contact with counsel for Butler and Slatter, and with Slatter himself. It was eventually agreed between IAM and Connex, which was represented by Butler and Slatter, that IAM would purchase the bank's interest in the conditional sales contract for cash with a view to holding a foreclosure sale in accordance with applicable local law in order to protect IAM's interest and expenses in the aircraft. Any excess funds were to be preserved subject to the outcome of the controversy continuing in the Bahamas over ownership of Connex stock. This arrangement was made on September 19, 1974. IAM paid $242,825.41 for the note and proceeded promptly with the foreclosure sale on October 10, 1974.

2. *The Conduct of the Sale.*

IAM formally notified Connex, Butler and Slatter, and the interests adverse to them, of the sale. On September 30, 1974, the Supreme Court of the Bahamas ordered the plane returned and Slatter notified IAM on October 3. Slatter recognized, however, that IAM was acting within its

---

2. It is not clear what interest or interests made payments on the note. The last payment was made by a slightly built Caucasian who tendered cash and refused to identify himself.

rights and took no legal steps to block the sale, although he threatened to do so. Determined to press forward, IAM advised Slatter and Butler on October 4, 1974, that "substantial costs" had already been incurred "in providing for public notice of the sale throughout the United States by advertisements in *The Wall Street Journal* and other trade press in order to obtain an optimum and commercially reasonable price for the aircraft." IAM also advised that its expenses exceeded $50,000 and that any excess funds would be preserved.

In fact, a single identically worded ad was placed in *The Wall Street Journal* and in *Trade-A-Plane.* Both publications had national distribution. *The Wall Street Journal* ad appeared as a public notice and not in the Aviation Section of its advertising, which is customarily used by the trade.[3] The advertising expense was in fact minimal, amounting to $531.57. *The Wall Street Journal* ad was a column wide and 2¾ inches long. The *Trade-A-Plane* ad, also a column wide, was 2¼ inches long. Thirteen days elapsed between *The Wall Street Journal* ad and the sale, and the *Trade-A-Plane* ad gave five days' notice. Both ads were written in matter-of-fact cautious terms that in no way encouraged buyer interest.

IAM was a dealer in aircraft and knew the market well, yet it took no further steps to attract buyers. It knew that the logical potential buyers were not individuals but a group of dealers. However, it made no effort by mail or telegram to stimulate their interest in the sale, although this is the accepted practice in normal commercial sales of this type of used aircraft. Further, IAM had a mailing list of 5,000 individuals, dealers, and companies known to be interested in receiving notices of available jet aircraft, and it had an available sales force. It used neither resource in the disposition of this aircraft.

The plane itself was sold on an "as is" basis. No steps were taken to improve its appearance or even to replace broken eyebrow windows that were covered by insurance. It would have taken more than $30,000 to put the plane in top condition. Since the plane was kept at secret locations until the moment of the sale, which was held at a small out-of-the-way airport on the Eastern Shore of Maryland, no opportunity for close inspection of the plane prior to the sale date was afforded, even when one dealer sought to do so prior to sale.

This was far from a routine matter. The plane was worth hundreds of thousands of dollars.[4] Planes of this type had never been sold at a public auction and, indeed, large jet aircraft had apparently never been sold previously at a creditor's sale. IAM well knew its obligation under all the circumstances to seek an adequate price.

IAM never advised Connex that it was not using its normal commercial procedures to stimulate interest in the plane and encourage an adequate price. Connex sat back and did little to concern itself with the sale, having practically no communication with IAM until shortly before the sale when Butler became apprehensive. At this point Slatter had no funds, and Butler decided not to put up any of his funds. A decision was made not to attempt to restrain the sale. No representative of Connex attended when the sale occurred on schedule.

At the time of sale IAM had made no arrangement to resell the plane and had no customer lined up. It did not intend to use the plane itself. It determined to bid only $325,000 which was the amount it figured it had invested commencing with Slatter's request that it "repossess" the plane. Its representatives came to bid that amount and no more. Without advance notice to potential bidders, the sum of $325,000 was fixed as the minimum acceptable bid. IAM knew the plane was worth substantially more than $325,000. Connex also was aware of its true value, but IAM knew that

---

3. In placing the ad, IAM stated, "We humbly request this ad be placed in the Financial Section."

4. In January, 1974, IAM sold two used Sabreliner 60's in separate transactions for slightly over $1,000,000 each and shortly after the sale it offered the Connex Sabreliner for $1,150,000.

plaintiff and its representatives were unwilling or unable to act as purchaser at the sale and had not taken over the creditor note which defendants later purchased from the New Jersey bank.

IAM was the only bidder at the sale and bought the plane for $325,000.[5] Substantial proof was offered as to the fair market value of the plane on the date of sale. Users of an executive jet such as the Sabreliner are wealthy individuals and corporations. Because this particular plane had a clouded history and was not in top operating condition it would not likely have been purchased at the end user price. The plane lacked current logs, it needed maintenance and refurbishing, and difficulties were suspected because of its exposure to operating conditions in foreign lands and its association with Vesco, which had become well known by the time of the sale. The most logical purchasers at a sale of this kind could be expected to be dealers who would correct the deficiencies and sell in turn to an end user. When reselling, a dealer would expect a substantial markup over the purchase price and expenses incurred to correct deficiencies and effect sales. Dealers would have been attracted to the sale if the minimum acceptable bid of only $325,000 had been advertised.

■ The price at which the plane was resold in March, 1975, has little bearing on its fair market value at the time of auction. Market conditions changed, and expensive work was done on the plane in the interim. Rockwell, a logical purchaser, knew of the sale in advance but because of doubts about title and condition of the plane decided not to bid.[6] One other dealer was skeptical and considered the opportunity highly speculative. The trade generally was aware that this particular plane was tied up in Vesco

maneuvers and there would have been genuine doubts about title in spite of the provisions of the Uniform Commercial Code. Considering the history of the plane, the high interest rates prevailing at the time, the need to expend from $75,000 to $100,000 to put the plane in shape, and weighing the testimony of the various jobbers and experts who testified as to the value, the Court concludes that the plane should have brought a minimum of $700,000 which was the fair market value at the time of the foreclosure sale.

■ The Uniform Commercial Code requires that foreclosure sales be made in a commercially reasonable manner. § 9–504(3). While a low price is not conclusive proof that a sale has not been commercially reasonable, a large discrepancy between sales price and fair market value "signals a need for close scrutiny" of the sales procedures. U.C.C. § 9–507; *In re Zsa Zsa Ltd.*, 352 F.Supp. 665, 671 (S.D.N.Y.1972). This is particularly true where the vendor is also the purchaser. *Id.*

■ As was noted by the Maryland Court of Appeals in *Harris v. Bower*, 266 Md. 579, 295 A.2d 870, 874 (1972), section 1–203 of the Uniform Commercial Code imposes an obligation of good faith on the performance of every duty under the code. Indeed, the official comment to section 9–507 indicates the existence of this good faith obligation. This means that the creditor must act to protect not only its interest, but the interest of the debtor as well. *Liberty National Bank and Trust Co. of Okl. City v. Acme Tool, etc.*, 540 F.2d 1375, 1382 (10th Cir. 1976). It also means that in an examination of the circumstances of a foreclosure sale, the knowledge and capability of the creditor may be considered.[7]

---

5. Although not disclosed, IAM had already pledged the plane prior to sale for an aircraft chattel mortgage with a St. Louis bank.

6. One of the plane's engines was owned by Rockwell and under a lease arrangement Rockwell had been seeking to locate the plane. It owed $50,000 under the arrangement. Coincident with the sale IAM agreed to pay Rockwell

$50,000 when a representative of Rockwell appeared at the sale and asserted its lien.

7. IAM argues that it met, *per se*, the requirements of commercial reasonableness because the sale was carried out in the "usual manner" of bank foreclosures. § 9–507. There was, however, no "usual manner" for a foreclosure sale of this type of aircraft. In the recognized

In this case the defendant is an entity with special resources and expertise for the sale of aircraft. It must act in accord with its knowledge and capability, and must be held to a higher standard than one not so well versed in the trade. The efforts at publicizing this sale were minimal. *See Mercantile Financial Corp. v. Miller*, 292 F.Supp. 797, 801 (E.D.Pa.1968). They were clearly insufficient for a creditor in the position of IAM. It knew who likely buyers were, had the ability to contact these buyers, and made no special effort to do so. *See Dynalectron Corp. v. Jack Richards Aircraft Co.*, 337 F.Supp. 659, 662 (W.D.Okl.1972). This failure takes on added importance given the short notice of sale the advertisements provided, the decision not to take any steps to prepare the plane, and the inability of IAM to show the plane. *Id.* IAM was simply required to give more consideration to the interests of Connex, particularly given the involved course of dealing between the parties. Under all the circumstances this was not a commercially reasonable sale. IAM failed in its affirmative duty to protect the debtor.

### 3. *Defenses and Damages.*

IAM has interposed defenses of estoppel, waiver and laches. None of these has merit. IAM contends that since the debtor had notice of the sale and took no action to protect its interests the pending claim should be viewed skeptically. According to IAM the debtor should have complained before the sale about the procedure, or should have bid on the plane to protect itself. Difficulty with this theory arises from the notice given to the debtor which had an unwarranted lulling effect. The debtor had no understanding of the sale methods being used, and given the puffing nature of the notice, could not be expected to. Moreover, while Butler now stands in the position of the debtor, at the time of the sale his right to speak for Connex was involved in litigation. The responsibility, by Court order, rested upon Slatter as liquidator of Fairborn. However, Slatter was in the Bahamas and under Court order to return the aircraft. Thus the commercial unreasonableness of the sale shall not be qualified or minimized by the debtor's failure to act more strenuously. Connex pressed its claims promptly after the sale through Slatter who moved as early as October 21, 1974.

IAM also claims prior full satisfaction of the claim. This contention lacks merit. The facts submitted in support consist primarily of formal court documents. The factual issue for the Court to resolve is whether or not the settlement did in reality constitute satisfaction of damage caused Connex by the public sale of the aircraft. When the present action was originally brought in this Court it was dismissed without prejudice because the then plaintiffs and intervenor were involved in complex litigation in the Bahamas with a view to determining, among other things, the true ownership of Connex. *Slatter v. International Airmotive, Inc.*, Civil Action No. 74–1635 (D.D.C. Order of Jan. 7, 1975). Subsequently that issue was settled and those then entitled to speak for Connex appeared in Court to press the claim against IAM. IAM was not a party to the Bahamian litigation nor did it participate in any way in the settlement. Fairly read, the settlement determined, among a large number of issues, the rights to Connex ownership and thus the right to proceed with the present litigation. It did not intend to resolve claims for damage from the sale of the aircraft caused by IAM. We are dealing with independent wrongs, not joint tortfeasors. Thus it is clear as a matter of basic fairness that the full satisfaction claim must be denied. *Derby v. Prewitt*, 12 N.Y.2d 100, 236 N.Y.S.2d 953, 187 N.E. 556 (1962); see also *Kyte v. McMillion*, 256 Md. 85, 259 A.2d 532 (1969).

Turning to the damage claims, the Court must consider plaintiff's claim for punitive damages and the issue of compensatory

---

market for aircraft such as this Sabrejet, normal practices would have required more effort than was expended by defendant. See p. 55 supra.

damages. The latter must be viewed in the context of defendant's counterclaims which will be more fully explained.

No punitive damages will be awarded. Plaintiff claims that IAM never intended to hold a bona fide public sale, and deliberately misrepresented and lulled plaintiff's representatives into not seeking to stop the sale. The Court rejects this claim of fraud. IAM proceeded with legal advice. It confronted an extremely complicated series of circumstances, largely not of its own making, and was placed at a disadvantage time and time again by the volatile and indecisive conduct of the Connex representative. Its involvement was not sought, but thrust upon it by the actions of Butler and Slatter. Moreover, a strong inference adverse to this claim by Connex exists because of its failure to produce Yellin, counsel for Slatter and Butler, who was deeply involved in all arrangements and discussions looking toward the sale, and whose conduct as shown by the documents is most ambiguous. Plaintiff did not establish by a preponderance of the evidence a fraudulent intent, bad faith or even reckless disregard of plaintiff's rights.

In setting aside the sale a number of consequences must be taken into account. Connex recognizes that IAM must be made whole. The parties are agreed that $259,758 covers certain itemized expenses that were reasonable and necessary relating to the repossession and custody of the plane prior to sale and cost of sale. The Court in addition finds that additional expenses for the same purposes totalling $45,571.17 were incurred and were reasonable and necessary, making a total of $305,329.71. This amount compares favorably with the $325,000 which IAM bid as a rough computation of what it had in the plane at the time of sale. Considering the vague nature of the financial arrangement made for repossession, the failure of Slatter to authorize prompt sale and the absence of any allowance of profit to IAM, the amount bid was reasonably owed for IAM's part in the venture.

IAM counterclaims for $50,000. It spent over $100,000 on the plane, largely in preparation for the March, 1975 resale. This sum included the $50,000 paid Rockwell for the engine. IAM says that after allowing for its expenses, and allowing for allocated overhead and profit, it lost $50,000 on the venture when the plane was resold in 1975 for $855,000. But on October 11, 1974, the day after the foreclosure sale, IAM certified that Connex had no further obligations to it. IAM's activities after the foreclosure sale cannot create new obligations in Connex. Thus the counterclaim will not be allowed.

The Court has decided that the appropriate disposition of the controversy entitles Connex to compensatory damages measured by the difference between the bid price and the fair market value at the time of sale, $375,000, plus interest at six percent from October 10, 1974. To the extent that IAM profits, or fails to profit, over and above its expenses is no concern of the Court.