494 A.2d 225

Richard KRAMER, et al.

v.

John T. EMCHE, et al.

No. 1553, Sept. Term, 1984.

Court of Special Appeals of Maryland.

June 24, 1985.

Certiorari Denied Oct. 21, 1985.

28

30

George F. Obrecht, III, Baltimore (Charles F. Obrecht, Jr. and Obrecht and Obrecht, Baltimore, on the brief), for appellants.

Charles J. Piven, Baltimore (David R. Cohan, Alice G. Pinderhughes and Cohan & Finkelstein, P.A., Baltimore, on the brief), for appellees.

Argued before GARRITY, GETTY and ROSALYN B. BELL, JJ.

GETTY, Judge.

This is an appeal by Richard E. Kramer and Harold E. Mirsky from several rulings and an Order of Judgment by the Circuit Court for Baltimore City regarding an unrecorded mortgage and a "General Release of All Claims and Covenant Not to Sue."

### Background

On December 6, 1980, John and Anna Emche (appellees herein) entered into an Agreement of Sale to sell their home, located on Northern Parkway in Baltimore City, to Van and Lois Durrer for $86,000.00. The Agreement also contained a financing clause which provided that the Durrers would execute a first mortgage to the Emches in the amount of $60,000. The settlement for the property took place on February 27, 1981, at the office of P. Paul Cocoros, a Baltimore attorney. At that time, the Emches executed and acknowledged a deed conveying the property to the Durrers. The Durrers, in turn, executed and acknowledged a mortgage on the property in the principal amount of $60,000 plus 14% per annum interest. Cocoros retained the mortgage for recording and, because the Durrers did not have sufficient funds to discharge the Emches' existing mortgage or to pay their share of the real estate taxes, recording fee and transfer costs, Cocoros also retained the deed. Possession of the property was nevertheless surrendered to the Durrers at the conclusion of the settlement.

In March of 1981, the Emches were notified by the First American Bank of Maryland that their existing mortgage had not yet been paid off. Mr. Emche phoned Cocoros to determine why the mortgage had not been discharged and Cocoros explained that the Durrers had not yet delivered the necessary funds for payment. At this time the Emches engaged the services of Ms. Dorothy Beaman, another attorney, to look into the matter.

In June of 1981, the First American Bank notified the Emches that the Durrers had discharged the mortgage held by that bank. Mr. Emche immediately filed the release of this mortgage and sent a copy of the release to Cocoros, requesting that he file the mortgage held by the Emches. This request was ignored. Over the next year the Emches and Ms. Beaman, their attorney, communicated frequently with Cocoros regarding the filing of the mortgage. Cocoros initially blamed his failure to record the mortgage on the fact that Mr. Durrer's check was no good, but in April of 1981 he notified Ms. Beaman that Mr. Durrer had made arrangements to continue to make the monthly payments.

In July of 1981, and again in September of that year, inquiries by the Emches disclosed that their mortgage was still unrecorded. In November of 1981, Ms. Beaman wrote to Mr. Cocoros and requested that he send the deed and mortgage to her for recording. Cocoros responded that he was still attempting to obtain the funds to record the mortgage. Ms. Beaman made several other requests that Cocoros forward the deed and mortgage to her, but to no avail.

Throughout this year long period, the Durrers made four quarterly interest payments to the Emches pursuant to the mortgage. The fourth payment was the last one the Emches would ever receive from the Durrers.

In March of 1982, the Durrers executed two deeds of trust to Richard Kramer and Howard Mirsky (appellants herein), as trustees, on the Northern Parkway property. The deeds of trust were given to secure repayment of

several outstanding loans incurred by the Durrers. Mr. Durrer phoned Cocoros and advised him that a messenger would pick up the deed and mortgage to deliver them to Richard Kramer. Cocoros then instructed his secretary to turn the documents over to Mr. Durrer's messenger, and she apparently did so.[1] Afterwards, Cocoros stated that he phoned Mr. Kramer's office on several occasions but apparently never spoke to him directly.

The first deed of trust was dated March 12, 1982, and was given to secure payment of $30,000, together with interest of 24% per annum to Michael and Stephen Levitt, the beneficiaries named in the deed. The second deed was dated March 17, 1982, and was given to secure the repayment of $38,500 plus interest at the rate of 24% per annum, to Arnold and Jane Finkelstein. For both of these transactions Mirsky served as mortgage broker, an occupation in which he was engaged for six or seven years prior to trial. During this time, Mirsky and Kramer shared office space and frequently worked together in real estate transactions.

At trial in the Circuit Court for Baltimore City, Mirsky testified that the procedure he followed in processing the March 1982, loans was the same procedure he followed in making other business loans. Mirsky stated that he would first appraise the property to assure himself that there was sufficient equity to cover the loan. He would then make two title searches: the first to determine the existence of any liens on the property; and the second, made after the filing of the lien, to verify that the mortgage or deed of trust securing the loan was reflected in the record.

Mirsky recalled that in the Durrers' case, the property was appraised at $90,000 which indicated sufficient equity for the contemplated loans. When Mirsky ordered a title report, however, he discovered that the Emches, not the Durrers, were the record owners of the property. When

---

1. Cocoros testified that he regained possession of the mortgage at a later time, but he could not recall from whom he obtained it.

Mirsky confronted Mr. Durrer, Durrer explained that while he was the owner of the property, the deed reflecting this fact had not yet been recorded because he did not have the money to pay the property and transfer taxes. Mirsky then advanced his own money to pay the taxes, and the loans went through. The deed, the Levitt deed of trust and the Finkelstein deed of trust were all recorded on March 17, 1982.

Two weeks after the Levitt and Finkelstein deeds of trust were recorded, on April 15, 1982, Cocoros recorded the Emche mortgage. When the Emches discovered that their mortgage was in a subordinate position to the previously recorded deeds of trust, they filed the present suit against Kramer, Mirsky, Cocoros and the Durrers seeking a declaratory judgment, injunctive relief and damages. At trial, the Emches proceeded against Kramer and Mirsky seeking to have their mortgage placed as a first lien against the property. The Durrers failed to appear and judgment by default was entered against them. The declaration, as to Cocoros and the Durrers, sought compensatory and punitive damages for negligence, fraud and conspiracy; breach of fiduciary duty was also alleged as to Cocoros.

Prior to commencement of trial the Emches reached a settlement with respect to all of the claims against Cocoros. The terms of the settlement were embodied in an eight page document entitled "General Release of All Claims and Covenant Not to Sue," which recited a monetary consideration of $80,000 paid by Cocoros to the Emches. The Release further specifies that the parties "have further agreed to allocate the $80,000 portion of the consideration given by [Cocoros] to [the Emches] for this Release as follows." What follows is a recitation of five separate categories of monetary allocation, the sum of which equals $80,000:

 (1) $35,000 for attorneys fees said to have been incurred by the Emches in pursuing their claims;

 (2) $3,150 for "expenses of litigation" apart from the attorneys fees;

(3) $39,000 for the Emches' agreement to forebear to press a claim for punitive damages;

(4) $1,000 for the Emches' agreement to forebear from complaining to the Attorney Grievance Commission;

(5) $1,850 for the Emches' agreement not to take the case to the media.

The document further specifies the following:

The Party of the First Part and the Party of the Second Part agree that this Release and Covenant not to Sue is not to be construed as and is not intended to be a joint tort-feasor release.

The Party of the First Part and the Party of the Second Part further agree that this Release and Covenant not to Sue shall in no way release Richard E. Kramer, Howard E. Mirsky, Van C. Durrer or Lois E. Durrer from any claim against one or all of them by the Party of the First Part whether arising out of the Lawsuit or not.

\* \* \* \* \* \*

It is the express and clear understanding of the parties hereto that this Release is intended only to release the Party of the Second Part based upon the consideration set forth herein and the Covenant not to pursue the causes of action set forth herein against the Party of the Second Part, hereby expressly reserving all rights the Party of the First Part has against all other parties to the Lawsuit other than the Party of the Second Part.

Also prior to commencement of trial, the deeds of trust on the Durrer property were foreclosed and the proceeds from the sale of the property, totaling some $91,851.95 were deposited into escrow accounts pending the outcome of the case.

The case was tried on October 8, 9, and 10, 1984. Cocoros immediately submitted to the court a request for Order of Dismissal as to Cocoros, based on the Emches' Release of All Claims against him. Kramer and Mirsky thereupon moved that the dismissal not be granted or, if granted, that all parties be dismissed or, failing that, that a continuance

be granted to enable Kramer and Mirsky to file a claim of their own against Cocoros and the Emches. The court denied all of the motions requested by Kramer and Mirsky and granted an Order of Dismissal as to Cocoros. The court also entered a judgment by default as to the Durrers, who had failed to appear at trial. The case then proceeded against Kramer and Mirsky alone.

On October 23, 1984, after reviewing memoranda which he had asked counsel to file, the trial judge delivered his decision from the bench. The court then issued the following Order for Judgment:

Upon a Trial and having considered Trial Memorandum by counsel and arguments thereon, it is by the Circuit Court of Maryland for Baltimore City this 30th day of October, 1984

Ordered, that [the Emches'] Mortgage be and is hereby placed in first position as to the property known as 10 West Northern Parkway, as a first lien thereon.

Further Ordered, that the total amount due and owing by [Kramer, Mirsky and the Durrers] to [the Emches] to be released and distributed is $83,247.00, plus per diem interest subsequent to October 29, 1984 at the rate of $31.50 per day.

Further Ordered, that $83,247.00 of the net proceeds from the foreclosure sale of the property known as 10 West Northern Parkway, Baltimore, Maryland 21220, which have been placed in two escrow savings accounts be released and distributed by David R. Cohan and J. Fred Cohen, as the Escrow Agents for said funds as follows:

(a) $60,000.00 to [the Emches] for the principal due on the property known as 10 W. Northern Parkway.

(b) Interest due on the unpaid remaining balance at 14% per annum for a total of $21,882.00 through October 29, 1984, plus per diem interest subsequent to October 29, 1984 at the rate of $31.50 per day.

(c) Late fees as provided in the Emche Mortgage (Clause 6) in the amount of $1,365.00.

Kramer and Mirsky now appeal to this Court from the trial court's rulings as to the Cocoros dismissal and Order of Judgment.

### The Dismissal Based on the Release

Kramer and Mirsky argue that the trial court erred "in giving literal effect to the 'allocations' of consideration, thus allowing double recovery of the mortgage debt." We agree in part.

 Under Maryland law, the intent of the parties to an instrument of release dictates the interpretation to be given to the instrument as well as its scope and effect. *Federal Land Bank of Baltimore, Inc. v. Esham,* 43 Md.App. 446, 467, 406 A.2d 928 (1979); *Shriver v. Carlin & Fulton Co.,* 155 Md. 51, 141 A. 434 (1928). *See Wheaton Triangle Lanes, Inc. v. Rinaldi,* 236 Md. 525, 204 A.2d 537 (1964); *Roe v. Citizens National Bank,* 32 Md.App. 1, 358 A.2d 267 (1976). As stated in *Roe,* 32 Md.App. at 6, 358 A.2d 267:

"In order to give effect to the manifest intention of the parties as nearly as possible, the courts have ... held that a release with ... a reservation [of rights against other joint obligors] is in legal effect no release at all, but merely a covenant not to sue. So in the case of joint and several liabilities, if the creditor while discharging the several liability expressly reserves the joint right, it is not discharged. Likewise, the joint liability may be released with a reservation of the several right. A right against other debtors is held to be reserved in any case where it appears from the terms of the release that it was not intended or expected that all the debtors should be released."

██ Kramer and Mirsky do not attempt to argue that the intention of the parties to the Release in the present case is unclear. The Release clearly and repeatedly indicates that it is to be given effect only as to Cocoros, and is not to

affect any rights the Emches might have as against any other parties. Kramer and Mirsky contend, however, that the Cocoros Release contravenes the one wrong-one recovery rule which precludes a party from double recovery for a single injury. *See Grantham v. Prince George's County,* 251 Md. 28, 246 A.2d 548 (1968); *Cox v. Maryland Railways Co.,* 126 Md. 300, 95 A. 43 (1915).

Generally, when two or more parties have united to cause tortious harm to another the "same injury" to the individual is obvious, as for example where two people are engaged in a fight and a third person joins in on behalf of one of the combatants. There is but one fight and one compensable injury resulting therefrom. The classic example is where the negligence of two drivers combines and results in injuries to a passenger in one of the vehicles.

The problem becomes more difficult where the injuries sustained are "related" rather than the "same." Logically, it would depend upon the nature of the injury sustained from each of the various tort-feasors and thus would be a question of fact. In *Huff v. Harbaugh,* 49 Md.App. 661, 435 A.2d 108 (1981), the plaintiff sued an adjoining property owner for damages sustained as a result of a fire that damaged plaintiff's property and caused his tenants to vacate. In the same suit, plaintiff sued his insurance agent for failing to procure a fire insurance policy on plaintiff's building. Before trial, plaintiff settled with the adjoining property owner. The insurance agent then alleged that the release of the joint tort-feasor also served to release him. We said that where it can be established that there is more than one wrong at issue, involving independent parties, the release of one wrongful party would not serve to release any other. In rejecting the insurance agent's argument, we held:

> "In accord with the foregoing principles we hold that where a wrong consists of separate and distinct, although closely related, injuries for which the parties are respectively liable, then the release of one with respect to his

wrongdoing will not discharge the other from liability for his share in the transaction."

A similar result was reached in *Kyte v. McMillion,* 256 Md. 85, 259 A.2d 532 (1969). In *Kyte,* the plaintiff was injured as a result of two successive tort-feasors, each causing a separate and distinct harm. First, the plaintiff was injured while a passenger in a negligently driven automobile, and second, the plaintiff was administered mismatched blood by a hospital nurse causing additional injury. Reiterating the principle that "there can be but one satisfaction for the same injury," the Court of Appeals held that the subsequent release of the hospital nurse, limited to the injury resulting from the negligent transfusion, did not preclude the plaintiff from asserting a claim against the driver of the automobile due to the wholly divisible nature of the injuries incurred. *See also, Cox v. Md. Elec. Rwys. Co.,* 126 Md. 300, 95 A. 43 (1915); *Grantham v. Prince George's County,* 251 Md. 28, 246 A.2d 548 (1967); and *Pemrock, Inc. v. Essco Co., Inc.,* 252 Md. 374, 249 A.2d 711 (1969).

Turning to the present case, we must determine whether the appellees herein sustained separate injuries. We conclude that they did not. The injury suffered was the untimely filing of appellees' mortgage which resulted in their claim being secondary to two deeds of trust executed after appellees' mortgage, but recorded prior thereto. Three separate parties contributed to this single injury: first, the Durrers who did not have the funds to conclude the transaction at the time of settlement and who exacerbated the matter by further encumbering the property; second, Cocoros, who held the deed and mortgage for nearly one year and who surrendered both instruments to the Durrers instead of obtaining the recording costs from the Durrers and filing the deed and mortgage himself; third, Mirsky and Kramer who were aware that the property was titled in the Emches' name and obtained a year old deed from the Durrers, asked no questions about the possibility of a mortgage, failed to contact the Emches or Coco-

ros and placed two deeds of trust on record establishing a priority for their own clients.

■ We agree with the trial court that all five of the players on this stage contributed to the injury sustained by appellees. We disagree, however, that separate injuries were involved. Had the Durrers paid the transfer fees enabling Cocoros to record the deed and mortgage, the appellees would have a valid, subsisting first mortgage for $60,000. Failure to be placed in that position is their injury and the responsibility for that failure may, as the trial judge found, be laid at the door of each of the tort-feasors who, in somewhat different fashion, contributed thereto. Appellees cannot, however, collect twice for one injury and allowing a settlement with Cocoros for $80,000 and then placing the Emche mortgage first would result in double recovery.

■ The release to Cocoros was cleverly couched in language that makes no reference to the mortgage indebtedness. Appellees confuse multiple causes of action set forth in their thirty-eight count declaration with singleness of the injury. Pleading several different theories or causes of action does not, in our view, transform a single injury into multiple injuries. Neither does a claim for punitive damages, claimed against Cocoros and the Durrers, accomplish that end. Punitive damages are not a "wrong or the product thereof, such damages are considered separate and apart from the underlying injury." *See Superior Construction Co. v. Elmo,* 204 Md. 1, 102 A.2d 739 (1954).

If we were to accept appellees' argument, then double recovery would hinge upon the skill of the person drafting the release. If the release attributed nothing to the underlying indebtedness, the debt would still be recoverable in addition to the amount of the settlement. Neither case law nor fundamental fairness supports such a theory.

■ Appellees cite *Roe v. Citizens' National Bank,* 32 Md.App. 1, 358 A.2d 267 (1976), and *Federal Land Bank of*

*Baltimore, Inc. v. Esham,* 43 Md.App. 446, 406 A.2d 928 (1979), stating:

> "If the creditor clearly manifests in the release instrument an intention to reserve its rights against the remaining obligors, then that intention will be given effect by the courts."

We agree with the principle as stated in the two cases cited and, manifestly, the Emches intended to release Cocoros and not the others. Construing a release according to the intent of the parties, however, does not serve as license for multiple recoveries upon a single liquidated obligation through an artfully worded release. In *Roe, supra,* the consideration for the release did not amount to full satisfaction of the debt and the creditor's rights against the other defendants were expressly reserved. We held that the intention of the parties prevailed and the creditor was entitled to seek the unpaid balance from the remaining defendants.

We note that Restatement (Second) of Torts, § 855, provides:

> (1) A valid release of one tortfeasor from liability for a harm, given by the injured person, does not discharge others liable for the same harm, unless it is agreed that it will discharge them.
>
> (2) A covenant not to sue one tortfeasor or not to proceed further against him does not discharge any other tortfeasor liable for the same harm.
>
> (3) A payment by any person made in compensation of a claim for a harm for which others are liable as tortfeasors diminishes the claim against the tortfeasors, at least to the extent of the payment made, whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment.

■ To the extent that the Emches were required to engage in litigation to establish the priority of their mortgage over the two subsequent deeds of trust, thereby

incurring additional attorney's fees and expenses, mere recovery of the amount due them under the mortgage will not fully compensate them for their injury. Counsel fees and other expenses of litigation do not ordinarily constitute an element of damages and would not be recoverable from the proceeds of sale held in escrow. Recovery of such costs from Cocoros, therefore, would not amount to double recovery for a single injury. We think the Emches were entitled to recover from Cocoros reasonable legal expenses they incurred as a result of his conduct in addition to the amount due them under the mortgage, and we shall remand the matter to the Circuit Court for Baltimore City for its determination of the legal fees and expenses incurred by the Emches.

■ The unsatisfied mortgage debt is $83,247 plus interest subsequent to October 29, 1984, at the rate of $31.50 per day. The Emches have received $80,000 from Cocoros, some portion of which constituted reasonable compensation for their legal fees and expenses. The balance thereof must be applied to the reduction of the mortgage debt. The remainder of the mortgage debt plus all interest accrued thereon shall be payable out of the escrow funds prior to payment of the debts secured by the two deeds of trust.

■ Kramer and Mirsky also argue that the trial court erred in excluding extrinsic evidence to explain the Cocoros Release. Where a release is complete and unambiguous, however, parol evidence is inadmissible to vary, alter, or contradict the terms of the release in the absence of fraud, accident or mutual mistake. *McLain v. Pernell*, 255 Md. 569, 258 A.2d 416 (1969). The Cocoros Release was complete and unambiguous and there is no indication that the Release was the result of fraud, accident or mistake. The court's refusal to admit extrinsic evidence to explain the Release was, therefore, proper.

■ Kramer and Mirsky next argue that the trial court erred in denying their motion for continuance in order to file a cross-claim against Cocoros, or a counterclaim

against the Emches. In denying these motions the trial court noted that Kramer and Mirsky knew or should have known that they had possible remedies against Cocoros since the beginning of the case. The court then refused to allow the filing of any additional actions at the last minute. The granting of the right to file a cross-claim or a counter-claim, after the time period for doing so has expired, rests in the exercise of the sound judicial discretion of the lower court and will not be disturbed absent an abuse of that discretion. *See Faulkner v. Town of Chestertown*, 290 Md. 214, 428 A.2d 879 (1981); *Read Drug & Chemical Co. v. Colwill Construction Co.*, 250 Md. 406, 243 A.2d 548 (1968). In the instant case, we are unable to find that the trial court committed an abuse of discretion in denying the last minute motions to interpose additional claims.

### *The Subordination of the Deeds of Trust to the Emches' Mortgage*

Finally, Kramer and Mirsky contend that the trial court was clearly erroneous in finding that Kramer and Mirsky had implied or constructive notice of the Emches' unrecorded mortgage.

The applicable law regarding when one is deemed to have had notice of a prior recorded interest was stated by the Court of Appeals in *Fertitta v. Bay Shore Development Corp.*, 252 Md. 393, 250 A.2d 69 (1969):

"The law requires reasonable diligence in the purchaser of real property to ascertain any defect of title. When such defect is brought to his knowledge, no inconvenience will excuse him from the utmost scrutiny. When a purchaser has notice of a fact which casts doubt upon the validity of his title, the rights of innocent persons must not be prejudiced as a result of his negligence. *Brush v. Ware*, 15 Pet. 93, 112, 10 L.Ed. 672, 680. A purchaser of land who is not a *bona fide* purchaser without notice takes the land subject to any prior equity and holds it as a constructive trustee in favor of a third person claiming it under a prior contract of sale. *Smoot v. Rea*, 19 Md. 398,

**44**

412. In determining whether a purchaser had notice of any prior equities or unrecorded interests, so as to preclude him from being entitled to protection as a *bona fide* purchaser, the rule is that if he had knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry, he will be presumed to have made such inquiry and will be charged with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued. *Baynard v. Norris*, 5 Gill. 468, 483, 46 Am.Dec. 647; *Higgins v. Lodge*, 68 Md. 229, 235 11 A. 846, 6 Am.St.Rep. 437. In other words, a purchaser cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to him; and if he neglects to make such inquiry, he will be held guilty of bad faith and must suffer from his neglect."

*Id.* at 402, 250 A.2d 69 (quoting *Blondell v. Turover*, 195 Md. 251, 257, 72 A.2d 697 (1950)).

 In the instant case, Mirsky was notified by a title search company that the Emches rather than the Durrers were the record owners of the Northern Parkway property. Mirsky then relied on representations by Mr. Durrer to explain the reason for this discrepancy in the land records. Mirsky had had previous business dealings with the Durrers and must have had some idea of their rather precarious financial situation. Despite these facts Mirsky made no other inquiries to discover for himself whether a prior lien existed on the Durrers' property. We are unable to conclude, under a totality of circumstances, that the trial court clearly erred in finding that Kramer and Mirsky were put on inquiry or constructive notice of the prior lien on the Northern Parkway property. Md. Rule 1086. Nor can we conclude that the facts and circumstances in the present case compel an application of the doctrine of equitable estoppel. There was no evidence presented to the trial court that the Emches' conduct would render it unequitable or unconscionable to allow the relief the Emches requested.

*See Zimmerman v. Summers,* 24 Md.App. 100, 330 A.2d 722 (1974).

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.

COSTS TO BE PAID BY APPELLANTS.