UNITED STATES of America,

v.

John RACHEL, et al.

No. CIV.A.WMN–02–754.

United States District Court, D. Maryland.

July 10, 2003.

Tamera Lynn Fine, Office of the United States Attorney, Thomas M. DiBiagio, Baltimore, MD, for Plaintiff.

Edward J. Tolchin, Fettmann, Tolchin and Majors PC, Fairfax, VA, for Defendants.

## MEMORANDUM

NICKERSON, Senior District Judge.

Before the Court are Defendants' Joint Motion for Sanctions, To Compel, and in Limine (Paper No. 16), Defendants' Joint Motion for Summary Judgment and Partial Dismissal for Lack of Jurisdiction (Paper No. 17), and the Government's Motion for Summary Judgment (Paper No. 26).[1] The motions have been fully briefed and are ripe for decision. Upon a review of the pleadings and applicable case law, this Court determines that no hearing is necessary (Local Rule 105.6) and that Defendants' Joint Motion for Sanctions, To Compel, and in Limine will be denied; Defendants' Joint Motion for Summary Judgment and Partial Dismissal for Lack of Jurisdiction will be denied, and the Government's Motion for Summary Judgment will be granted in part and denied as moot in part.

## I. BACKGROUND

On November 17, 1994, Defendant RGI entered into a "Teaming Agreement" with Diez Management Systems, Inc. (DMSI) to cooperate in obtaining and satisfying an Internal Revenue Service (IRS) contract for computer maintenance and repair. Defendant John Rachel, owner and president of RGI, signed the Teaming Agreement on behalf of RGI. The contract, known as MNOMAP, had two components: on-site maintenance for all of the computer equipment in IRS facilities in the Washington, D.C. region, and nation-wide mail-in repair of laptop or notebook computers. On or about October 1, 1995, DMSI was awarded the IRS contract. Under the terms of that contract, DMSI would service and repair laptop computers for the IRS, billing the IRS for the actual cost of time and materials utilized in the repairs, plus a fixed markup.

John Rachel, along with a design team of RGI employees, developed a means to

---

1. Also before the Court is the Government's Motion to Amend or Correct the Scheduling Order (Paper No. 14). Subsequent to its filing of this motion, the Government characterized it as "moot." Accordingly, the Court will deny it as moot.

repair the broken laptop hinges (the "Hinge Repair Kit"). Rachel created initial prototypes of the Hinge Repair Kit; one prototype was prepared by Technical Design Resources (TDR). Rachel later obtained a patent for his Hinge Repair Kit.

Under the IRS–DMSI contract, when an IRS laptop computer needed its hinge repaired, it was mailed or shipped to a location which met the security requirements for safeguarding IRS property and information. This location was referred to as the depot or the repair depot. At the depot, RGI and later DMSI employees would prepare each laptop computer for repair by removing the screen and any electronics from the laptop cover. John Rachel personally picked up the laptop covers from the depot and delivered them to TDR, which was responsible for manufacturing the Hinge Repair Kits in accordance with the specifications set forth in the patent. TDR personnel installed the Hinge Repair Kits as set forth in the patent. Rachel would then personally pick up the covers with the Hinge Repair Kits installed and return them to the depot, where employees would reassemble the laptops.

Initially, RGI obtained the Hinge Repair Kits directly from TDR. Later, however, another company, Computer Specialties of Maryland (CSM), obtained the repaired laptops from TDR. On or about October 17, 1995, John Rachel executed Articles of Incorporation for Defendant CSM. The CSM Articles of Incorporation were filed on October 23, 1995. Defendant Priscilla Rachel is the wife of John Rachel and served as the Secretary to CSM. CSM had no employees; it paid no wages or salaries during its existence. Its financial records were maintained by John Rachel at his residence or RGI offices. CSM's physical address, was RGI's office space in Glen Burnie, Maryland. Its mailing address was a post office box. Among the services

John Rachel performed for CSM was preparing CSM's invoices to RGI for the Hinge Repair Kits, which TDR had installed in the laptop cover shells delivered by John Rachel. Rachel prepared the CSM invoices on a typewriter in his kitchen.

TDR invoiced CSM an amount between $23.20 and $26.70 for each Hinge Repair Kit manufactured and installed. CSM paid these invoices. CSM then invoiced RGI $117 for each Hinge Repair Kit manufactured and installed by TDR. RGI prepared and submitted invoices to DMSI, billing DMSI $122.84 for each Hinge Repair Kit. DMSI included the payments to RGI in its invoices to the IRS for payment of services rendered under the Contract, billing the IRS $128.99 for each Hinge Repair Kit. The IRS paid those invoices.

In November 1997, the IRS terminated the Contract. Subsequently, CSM ceased all operations, forfeited its corporate charter, and closed its bank accounts.

The Government brought the present action against Defendants RGI, CSM, John Rachel, and Priscilla Rachel on the basis of the invoice markup between CSM and RGI. As explained above, CSM invoiced RGI for approximately five times its cost from TDR. The Government alleges that this markup was fraudulent and that John and Priscilla Rachel profited significantly from the inflated costs passed on between CSM and RGI, both controlled by John and/or Priscilla Rachel. In the instant action, the Government alleges violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) (Count I), violation of the False Claims Act, 31 U.S.C. § 3729(a)(2) (Count II), violation of the False Claims Act, 31 U.S.C. § 3729(a)(3) (Count III), fraud—common law (Count IV), negligent misrepresentation (Count V), breach of contract—RGI and CSM only (Count VI), payment under mistake of fact (Count VII), and unjust enrichment (Count VIII).

Both the Government and Defendants move for summary judgment as to all counts of the Complaint. The Government seeks summary judgment with respect to liability alone at this time.

## II.  LEGAL STANDARD

A moving party is entitled to summary judgment only if it can show that there exists no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Blue Ridge Ins. Co. v. Puig,* 64 F.Supp.2d 514 (D.Md.1999) (citing, *inter alia, Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

When both parties file motions for summary judgment, the court applies the same standards of review. *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment.")(emphasis omitted), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. and Indem., Co.,* 627 F.Supp. 170, 172 (D.Md.1985)(quoting Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 2d § 2720 (2d ed.1993)).

2. The Court notes that Defendants failed to comply with Local Rule 104.8, which requires that the parties exchange their motions to compel, opposition memorandum, and any reply and then discuss the dispute *before* filing papers with the Court. Defendants argue that they complied with the spirit, if not the technical requirements, of the Local Rules.

## III.  DISCUSSION

### A.  Defendants' Joint Motion for Sanctions, to Compel, and In Limine

Defendants move pursuant to Federal Rules of Civil Procedure 26 and 37 for an order of sanctions "in the nature of an order in limine to preclude the government from offering evidence to support its claims and for costs and fees, and an order compelling production of documents withheld under a claim of privilege, and for amendment of admission responses." Defs.' Mot. at 1.[2] With respect to the request for an order in limine, Defendants argue that the Government's proffered 30(b)(6) witnesses, interrogatory responses, and document responses were so lacking as to constitute no proffer or response at all. *Id.* at 8. First, with respect to the 30(b)(6) witnesses, Defendants claim that the designees had virtually no knowledge of anything listed in their deposition notice. *Id.* According to the Government, defense counsel refused the Government's initial offer of two agents as the 30(b)(6) designees. The Government then produced for him the individuals he requested, but notified him that these individuals were limited to discussing the matters of which they had personal knowledge, because they were uninvolved in the investigation or case. After taking their depositions, defense counsel expressed his dissatisfaction with the witnesses and indicated that he would depose one of the agents originally offered by the Government. That agent was deposed within a week. In the cross-examination of that

*See* Defs.' Reply at 3–4. The Court will consider Defendants' motion in the interest of judicial efficiency but notes that its decision to do so should not be construed as excusing Defendants' failure to follow the procedures mandated by this Court in its Local Rules. *Coogan v. Cornet Transp. Co., Inc.,* 199 F.R.D. 166, 166–67 (D.Md.2001).

agent, Government counsel had the agent trace through several transactions to identify what the Government believed to be the fraudulent conduct. Govt.'s Opp. at 8–9. During this cross-examination, defense counsel made repeated comments about the cross-examination wasting his time, and it appears from the transcript that he was on the telephone during a portion of the cross-examination. *See* Govt.'s Exh. 13 to Govt.'s Mot. for Summary Judgment, Luzier Dep., at 91.

■ The Court will not enter an order for sanctions against the Government for the 30(b)(6) witnesses. The Court is satisfied that the Government fulfilled its discovery obligations with respect to its designees. It appears from the record that Defendants had more than an adequate opportunity to depose a wide variety of people related to the underlying transactions.

■ Second, with respect to the interrogatory responses, Defendants argue that the Government's response referring Defendants "to the documents produced pursuant to the Response to Request for Production for such additional witnesses or information as may be derived or ascertained from such records as easily by the Defendants as by the United States" (Defs.' Exh. 6, Plaintiff's Answers to Interrogatories, at 3, 5, 6, 8, 9, and 12) was unacceptable and equivalent to no response at all. The Court concludes that the Government's interrogatory responses were appropriate. The interrogatories were extremely broadly worded. *See* Defs.' Exh. 6, Plaintiff's Answers to Interrogatories. Federal Rule of Civil Procedure 33(d) allows a party the option to produce the records when the requesting party is as capable of reviewing documents and formulating a response to the interrogatory as is the answering party. The Court concludes that the Government appropriately used Fed.R.Civ.P. 33(d) in this situation.

Finally, with respect to the document production, Defendants claim that the Government did not comply with Fed.R.Civ.P. 33 "in any way, shape, or form." Defs.' Mot. at 10. According to Defendants, the documents consisted of 175 boxes of materials, an additional 10 filing cabinets of documents, and numerous computer diskettes and were produced in "an unheated, unlit garage, stacked 8 feet high and 2–4 files/cabinets deep along the walls, with additional boxes and documents in the middle of the garage. There were no chairs, no table, no room to separate the materials, and no room to even walk inside the garage." *Id.* at 3.

■ The Court concludes that the Government's actions were appropriate. The document requests were again extremely broad, and the Government provided access to all available documents. According to the Government, these documents were provided as they were maintained in the ordinary course of business in the government investigation. They were maintained in the same location and form when reviewed by government counsel. Further, the Government provided the two agents assigned to the case to the defense counsel to assist him in the same manner as they assisted government counsel. When defense counsel complained about the production location, he was told, then and later, that he could identify all or some of the boxes, and they would be relocated to a conference room for his review under more comfortable conditions. He failed to take advantage of this accommodation at any time.

Defendants also claim that the Government failed to respond in a timely manner to some of their requests, i.e., a request for an inventory of the document warehouse and a Vaughn index of privileged docu-

694

ments. Defs.' Mot. at 5–7. The record reflects that any delays were the result of an injury to the government counsel, who required surgery for a broken foot, and the subsequent weather delays. The Government produced the inventory within a few days of its receipt by government counsel, if the days of forced absence are excluded. Likewise, the Vaughn index of privileged documents was provided within days of government counsel's return to the office after her injury. Moreover, government counsel repeatedly offered to extend discovery if these delays caused any hardship or prejudice for Defendants; Defendants refused any extension. Govt.'s Opp. at 12.

■ Additionally, Defendants argue that the Government has waived any claims of privilege by disclosing the privileged documents to Defendants. Defs.' Mot. at 12. At the warehouse, Defendants apparently viewed some documents that were accidently left out but contained privileged information. Defendants now argue that the "so-called privilege has been waived, and the documents listed [as privileged] should be ordered to be copied and provided to defendants forthwith." Defs.' Mot. at 15. According to the declarations of the special agents assigned to this case, one folder of privileged agent notes were inadvertently left in the storage facility. As soon as the agent realized that defense counsel had these documents, he retrieved them and told defense counsel at that time that they were privileged and were not supposed to be in the facility. Govt.'s Opp. at 12. Under the standard adopted by the Fourth Circuit in *In re Grand Jury Proceedings,* 727 F.2d 1352 (4th Cir.1984),

these documents have clearly been identified as agent notes, which were work product materials and were segregated from other documents. They were intended to be confidential and were treated accordingly. The momentary lapse in failing to remove them from the storage facility was not a knowing and voluntary waiver of any privilege, and the Court will not order the Government to produce them to Defendants.

■ Finally, Defendants argue that the Government should be directed to amend its admission responses. Defs.' Mot. at 15–16. According to Defendants, "it is beyond clear that plaintiff's claim of lack of knowledge regarding the Ichiban matter[3] was incorrect from day one." *Id.* Defendants claim that during their document review, defense counsel found numerous Ichiban related materials that answered the admission requests and now argue that the Government should be ordered to amend its admission responses accordingly. The Court declines to do so. It appears that Defendants want to use these responses to show that Ichiban sold products at a price "comparable to the price that the government claims here constituted overcharges by defendants when [defendants] sold that same product." Defs.' Mot. at 3. As explained below, what is relevant in this action is whether the CSM markup of the TDR invoice was fraudulent. *See infra* at 696. Whether another company sold a product at the same price as Defendants is simply not relevant to the issue of whether Defendants fraudulently inflated their invoices. Based on the above analysis, the Court will deny Defendants'

**3.** Ichiban was identified by Defendants as a company that sold that same product at issue in this case at a price comparable to the price charged by Defendants. Defs.' Mot. at 15. Several of Defendants' Requests for Admissions relate to Ichiban and this topic. *See* Defs.' Exh. 8, Plaintiff's Response to Defen-

dants' First Request for Admissions. The Government in its responses noted that it was unable to respond at that time to these admissions and that "to the extent the United States is subsequently able to respond to these admissions, it will file updated responses." *Id.*

Joint Motion for Sanctions, to Compel, and in Limine.

### B. *Cross Motions for Summary Judgment*

Under the False Claims Act (FCA), it is unlawful for any person to

(1) knowingly[4] present[ ], or cause[ ] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim[5] for payment or approval;

(2) knowingly make[ ], use[ ], or cause[ ] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspire[ ] to defraud the Government by getting a false or fraudulent claim allowed or paid ....

31 U.S.C. §§ 3729(a)(1)-(3).

As mentioned above, in this action, the Government alleges that RGI owner John Rachel formed a shell corporation, CSM, in order to inflate costs and issue false invoices to RGI, which RGI then used to bill the prime contractor, DMSI. In this manner, RGI would appear to be in compliance with the pricing terms of the DMSI–IRS Contract, while its alter ego, CSM, also wholly owned by John Rachel, would make a profit of approximately 300 to 400 percent. As an initial matter, Defendants argue that "there is no evidence anywhere in the record that Priscilla Rachel had any involvement in anything relevant to the facts of this case." Defs.' Mot. at 19. Defendants claim that she "knew nothing, received nothing, worked on nothing, and had no connection to the acts alleged in the complaint," and that summary judgment in her favor is appropriate. *Id.* In support of their arguments, Defendants cite cases in which "innocent spouses" have escaped liability. *See* Defs.' Opp. at 37–39. The Government argues that although Priscilla Rachel was not involved in the day to day operation of the scheme, she was a member of the board of directors of RGI during this period; she allowed her husband to use and sign her name freely and conduct business in her name; and her husband prepared the CSM invoices in their kitchen. Govt.'s Mot. at 19.

Under 31 U.S.C. § 3729(b), the FCA defines the terms knowing and knowingly broadly to include individuals who act in "deliberate ignorance" or "reckless disregard" of the facts. The "corporate ostrich" was a specific target of Congress when it drafted the statutory language. According to the Senate Judiciary Committee, the definition of knowing and knowingly "attempts to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquires which would alert him that false claims were being submitted." S.Rep.No. 345, 99th Cong., 2d Sess. 17, 21 (1986), *reprinted* in 1986 U.S.C.C.A.N. 5266.

---

4. For purposes of the FCA, the terms " 'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

5. Under the FCA, a " 'claim' includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

■ In this case, the Court is satisfied that Priscilla Rachel acted at least in reckless disregard of the truth or falsity of the information being submitted by CSM to RGI and eventually to the IRS. She served on the board of directors of RGI and had obligations with respect to the performance of those duties. Govt. Exh. 1., Defs.' Responses to Pl.'s First Request for Admissions (Admission Responses), at ¶¶ 30, 31; Govt. Exh. 11, P. Rachel Dep., at 7–9. She was identified in documents as an incorporator, officer, and director of CSM. Govt. Exh. 10, CSM Articles of Incorporation; Govt. Exh. 12, Combined Resolution Signet Bank. Both John and Priscilla Rachel admitted that she allowed her husband to use her name and her identity to conduct business for her. Govt. Exh. 2, J. Rachel Dep., at 60–61, 65–66; P. Rachel Dep. at 45–47. Based on the above discussion, the Court concludes that summary judgment as to Priscilla Rachel based on the level of her involvement is inappropriate.

In their motion for summary judgment, Defendants argue "nothing in any contract or law precluded RGI or any defendant from charging $122.85 to DMSI or the IRS for this hinge repair." Defs. Mot. at 3.[6] Defendants focus on the MNOMAP Contract between the IRS and DMSI and argue that because RGI was not a party to that contract, it was not bound by its terms. *Id.* at 15. Additionally, Defendants claim that "nothing in any federal statute or regulation required RGI to charge any particular amount, or prohibited RGI from charging any amount it desired, for the hinge repair." *Id.* at 18.

■ In the Government's motion for summary judgment, it argues that Defendants' conduct violated the FCA, without reference to the Contract or the Federal Acquisition Regulations (FAR), because Defendants caused a false claim (composed of the inflated invoice from CSM to RGI) to be submitted to the United States by DMSI. Govt.'s Mot. at 17–18. Under the FCA, a direct contractual relationship with the Government is not required for liability. The provisions of the FCA indicate "a purpose to reach any person who knowingly assisted in causing the Government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the Government." *United States v. Veneziale,* 268 F.2d 504, 506 (3rd Cir.1959) (citing *United States ex rel. Marcus v. Hess, et al.,* 317 U.S. 537, 544–45, 63 S.Ct. 379, 87 L.Ed. 443 (1943)). Here, the relevant inquiry is whether the CSM markup of the TDR invoice was fraudulent.

Defendants argue that the markup was justified because of the additional costs incurred by CSM, beyond the cost of the

---

**6.** Defendants argue that the IRS knew from the beginning that each repair would cost $122.85 and that "everyone understood that it covered the warranty risk . . . ." Defs. Mot. at 16. Before the Contract was awarded, Defendants met with George Watona, the Government's Contracting Officer's Technical Representative to discuss some aspects of the Contract. The issue of cost arose during this discussion, and according to Watona's deposition, he asked an RGI representative to give an estimate on what the hinge repair would cost per unit. Defs. Exh. 20, Watona Dep., at 10. In response, the Government argues that Watona was clear that he was seeking just a ball-park figure for the hinge repair. He was not responsible for negotiating any financial aspects of the contract, and he simply lacked the authority to agree on a fixed price contract on this or any other item. *Id.* at 37–38. Moreover, the final IRS–DMSI Contract is very specific that it is a time and materials contract that requires that materials be billed at cost, not a fixed-price contract. Defs.' Exh. 6, MNOMAP Contract. The Court affords little weight to Defendants' contention that the Government understood that it would be paying for the hinge repair and the warranty cost, and therefore, no fraudulent behavior on behalf of Defendants occurred.

Hinge Repair Kits from TDR. Defendants claim that the price reflected a warranty cost to cover the work performed;[7] "an enormous minimum order" that Defendants guaranteed to TDR; "payment of Mr. Rachel for his time, risk and efforts in developing and patenting the item;" costs incurred in patenting the device; and administrative costs. Defs.' Opp. at 22. With respect to the minimum order, the evidence Defendants cite in response does not support their argument. Defendants' Exhibit 22 does not include any testimony of this order where indicated, and Defendants' Exhibit 23 is an informal letter indicating that, rather than being guaranteed a minimum amount of work, TDR was informed only that it would be asked to supply "up to" a certain number of hinge repair kits. With respect to the other costs presented by Defendants in their pleadings, Defendants simply provide no evidence to support their arguments.

When asked at his deposition to explain the markup, John Rachel attributed it to normal business expenses, guarantees, and warranties. J. Rachel Dep. at 121–22. He claimed he had to make warranty payments and "a lot of other things." *Id.* at 128. Rachel admitted, however, that he never drew a salary from CSM, that CSM had no employees, that he personally picked up and delivered the laptops to and from the repair depot, and that he prepared CSM's invoices in the kitchen of his house. *Id.* at 121–22.

The Court concludes, with little difficulty, that the CSM markup of the invoice was fraudulent. As explained above, CSM and RGI were owned by the same person. CSM had no employees, paid no wages or salaries during its existence, used as its physical address RGI's office space in Glen Burnie, Maryland, used a post office box as its mailing address, and kept its records in John Rachel's house and/or in his office at RGI. Additionally, it ceased operations at some point after the Government terminated the IRS–DMSI contract. With respect to the warranty expenses, no evidence was presented regarding the actual costs, and Defendants admit that CSM did not specifically segregate funds to provide for warranty expenses. Admission Responses, at ¶ 91. The Court finds it difficult to believe that a six-month warranty would cost four times the amount of the product itself. Because Defendants have failed to demonstrate that a triable issue of fact exists for trial, the Court must grant summary judgment as to liability in favor of the Government as to Counts I, II, and III.[8]

■■■ Counts VI through VIII of the Complaint plead different theories of liability (e.g., fraud, breach of contract, unjust enrichment, etc.) for the same injury to the Government—the markup of the CSM invoice. The one wrong, one recovery rule precludes a party from double recovery for a single injury. *Kramer v. Emche,* 64 Md.App. 27, 40, 494 A.2d 225 (1985) (citing *Cox v. Maryland Railways Co.,* 126 Md. 300, 95 A. 43 (1915)). "[P]leading several different theories or causes of action does not ... transform a single injury into multiple injuries." *Id.* at 40, 494 A.2d 225. Because the Court has determined that Defendants are liable for this injury under the FCA, it will deny as moot both Defendants' and the Government's motions for

---

7. In the IRS–DMSI Contract, the Government required "the Contractor to propose a solution including a six-month warranty (parts and labor) on repairs to the ... notebook hinges/cases." Defs.' Exh. 6, MNOMAP Contract, at ¶ C.5.3.

8. Because the Court concludes that Defendants have not shown that they are entitled to judgment as a matter of law, it will deny Defendants' motion for summary judgment as to Counts I, II, and III.

summary judgment as to the remaining counts.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Defendants' Joint Motion for Sanctions, To Compel, and in Limine and Joint Motion for Summary Judgment and Partial Dismissal for Lack of Jurisdiction, and will grant in part and deny as moot in part the Government's Motion for Summary Judgment.